IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**


IN RE INTEREST OF CAMDEN R. & KAYDENCE R.


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


IN RE INTEREST OF CAMDEN R. AND KAYDENCE R., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

SAMANTHA P., APPELLANT.


Filed December 20, 2022.    Nos. A-22-286, A-22-287.


Appeals from the County Court for Dawson County: JEFFREY M. WIGHTMAN, Judge. Affirmed.

Claire K. Bazata, of Berreckman & Bazata, P.C., L.L.O., for appellant.

R. Garrett Goodwin, Deputy Dawson County Attorney, for appellee.


MOORE, RIEDMANN, and BISHOP, Judges.

BISHOP, Judge.

## INTRODUCTION

Samantha P. appeals from the decision of the county court for Dawson County, sitting as a juvenile court, changing the permanency goal for her children to adoption. We affirm.

## BACKGROUND

Samantha and Charles R. are the biological parents of Camden R., born in 2019, and Kaydence R., born in 2021.

In February 2020, there were concerns about the condition of the parental home, domestic violence, and drug use. When Charles allowed law enforcement and a child and family services worker into the home, the home "smelled of marijuana," drug paraphernalia was observed, and the home was "very dirty." Charles agreed that Camden would stay with his paternal grandparents

- 1 -

while Samantha and Charles cleaned the home. Intensive family preservation services were put in the parental home and Samantha and Charles were offered a voluntary case. Samantha and Charles agreed to allow Camden to stay with his paternal grandparents and have visitation.

On March 19, 2020, the State filed a petition alleging that Camden fell within Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) because he lacked proper parental care by reason of the faults or habits of his parents; his parents neglected or refused to provide proper or necessary subsistence, education, or other care necessary for his health, morals, or well-being; or he was in a situation injurious to his health or morals. The State also filed a motion for the immediate temporary custody of Camden to be placed with the Nebraska Department of Health and Human Services (DHHS). The State alleged that Camden was placed in a protective hold on March 18 "based on the continued domestic violence between the parents (leading to the arrest of Charles R[.]), the failure of the parents to abide by a voluntary plan with [DHHS], drug use in the home, the unsafe conditions of the home, and the parents['] inability to care for the minor child." The juvenile court entered an ex parte custody order on March 19, and Camden has since remained in the custody of DHHS and in relative foster care with his paternal grandparents.

On June 19, 2020, the State filed an amended petition alleging that Camden fell within § 43-247(3)(a) because he was without proper support through no fault of Samantha. The allegations against Charles were the same as they were in the original petition. That same day, Camden was adjudicated as being within the meaning of § 43-247(3)(a) based on Samantha's and Charles' "no contest" pleas to the allegations in the amended petition. The juvenile court ordered reasonable visitation as determined by DHHS.

Following a disposition hearing on August 13, 2020, and a review hearing on November 25, the juvenile court stated that the permanency goal was reunification. Following a review hearing on March 17, 2021, the permanency goal was changed to reunification with a concurrent goal of adoption. And following a review hearing on June 16, the permanency goal was adoption with an alternate goal of reunification. During the disposition and review hearings, the court ordered the parties to have reasonable visitation as determined by DHHS and to comply with the terms of various DHHS case plans that were adopted by the court, but those plans do not appear in our appellate record.

Shortly after Kaydence's birth, and while he was still in the hospital, the State filed a petition on May 19, 2021, alleging that Kaydence fell within § 43-247(3)(a) because he was homeless or destitute, or without proper support through no fault of his parents; lacked proper parental care by reason of the faults or habits of his parents; his parents neglected or refused to provide proper or necessary subsistence, education, or other care necessary for his health, morals, or well-being; or he was in a situation injurious to his health or morals. The State also filed a motion for the immediate temporary custody of Kaydence to be placed with DHHS. The State alleged that DHHS was concerned for newborn Kaydence if he left the hospital in the care of either parent because Samantha and Charles had an older child in the care and custody of DHHS and had made minimal progress in that case. The juvenile court entered an ex parte custody order that same day, and Kaydence has since remained in the custody of DHHS and in relative foster care with his paternal grandparents.

On July 8, 2021, the State filed an amended petition alleging that Kaydence fell within § 43-247(3)(a) because he was homeless or destitute, or without proper support through no fault

of his parents. That same day, Samantha pled "no contest" to the allegation in the amended petition; the juvenile court adjudicated Kaydence accordingly and ordered reasonable visitation as determined by DHHS. On August 4, Charles also pled "no contest" to the allegation in the amended petition; the court adjudicated Kaydence accordingly and ordered reasonable visitation as determined by DHHS.

Following a disposition and review hearing on September 15, 2021, the juvenile court stated that the permanency goal for both children was reunification with an alternative goal of adoption. The court ordered the parties to have reasonable visitation as determined by DHHS and to comply with the DHHS case plan of September 9, but that plan does not appear in our appellate record. The next review hearing was set for December 15, 2021.

DECEMBER 2021 REVIEW HEARING AND ORDER

A review hearing was held on December 15 and 17, 2021. Testimony was given by DHHS and Samantha; Charles did not testify. Exhibits were also received into evidence. A summary of the relevant evidence follows.

Samantha and Charles had a history of domestic violence starting prior to the birth of their children. In 2017, Charles pled guilty to third degree domestic assault with Samantha as the victim; a charge of strangulation was dismissed on the prosecutor's motion.

Kylee Hoffmaster was the initial assessment worker involved at the inception of Camden's voluntary case in early 2020 and she "had worked two prior intakes both with regards to concerns for domestic violence between [Samantha] and [Charles]." The third intake was "voluntary placement based on the conditions of the home, drug paraphernalia that was found in the home, as well as the arguments" between Samantha and Charles; they allowed Camden to go stay with Charles' parents. During the voluntary portion of the case, Samantha was observed with a black eye, and when asked about it, the domestic violence was reported to Hoffmaster and law enforcement; according to Hoffmaster, Samantha stated that Charles hit her in the face causing the bruise, after initially stating that she had walked into a wall. Hoffmaster was informed by Charles that Samantha told him that Hoffmaster coerced her into giving a statement to law enforcement; Hoffmaster denied coercing Samantha. Hoffmaster had concerns about Samantha's honesty and had discussions with her about the importance of being honest with DHHS and law enforcement; "[t]hat was discussed the very first day of the intake that led to Camden being removed" and after Charles said Samantha told him she was coerced. Hoffmaster stated, "I did discuss with [Samantha] that there were events that were reported that I hadn't had any knowledge of until arriving at the police department," and that Samantha and Charles could continue their relationship but "their domestic violence would have to be addressed" or it would be hard to work on reunification.

Paige Peterson testified that she has been the family's caseworker since May 2021. She authored the DHHS court report and case plan dated December 8, 2021, and her testimony at the review hearing was consistent with her court report and case plan.

According to the DHHS court report and case plan, Samantha continued to make progress on her case plan and goals. She attended counseling, had maintained safe and stable housing since February 2021, had been employed since June, and had been consistent with visitation and there

were no concerns with her parenting abilities. Peterson testified that Samantha had 20 hours of semisupervised visitation each week and overall, Samantha's visits go "very well."

The DHHS case plan and court report states that Samantha had been able to demonstrate periods free of substance use since the last court hearing, but tested positive for methamphetamine on August 29, 2021, and tested positive for THC on October 16 and 22. However, Peterson testified that, despite testing positive, Samantha "denies any use at all" and attributes her positive tests to environmental factors and the people that she was around.

According to the DHHS court report and case plan, in October 2021, DHHS was informed that Samantha and Charles were going to work on their relationship and Charles was moving back into the home; DHHS "was concerned due to the history of their relationship and the domestic violence that has occurred between them."

The DHHS court report and case plan states that in October 2021, Charles contacted DHHS and wanted to start working on his case; he had not been actively involved in the case since May. Charles's drug patches on November 6 and 18 were positive for THC, but his November 11 test was negative. After an approved 2-hour visit with his entire family on Thanksgiving Day, DHHS agreed to allow Charles to have one supervised visit per week, but the visit would not be part of Samantha's visitation.

Peterson testified that Charles is not allowed to be at Samantha's home during her visits. However, Charles' parents told Peterson that at Thanksgiving, Charles said that when Camden sees him, he expects toys because when Samantha was having visits Charles would go to the window and hold a sack in front of the window so that Camden could see it, and then he placed the sack on the deck so that Samantha and the child could come out and get the toy after Charles left. When asked if that was ever reported to her by Samantha, Peterson responded, "No, that was not." There were concerns that Charles had been present at visits, but nothing else was reported. In her testimony, Samantha denied that Charles was present on her property during a visit when he was not supposed to be. However, Samantha also stated, "[W]hen [Charles] would drop off the car, I would leave the window open, and then Camden would sometimes see him outside" and then "I would have to redirect Camden."

Peterson testified that Samantha participated in drug and alcohol counseling and mental health counseling, Samantha and Charles participated in couples' counseling (as of the date of her court report and case plan, they had attended two sessions), and Charles participated in substance use counseling. Peterson stated that Samantha "has done a very good job of taking advantage of those services," while Charles "is new to those services" and "[i]t's more of an intake process for him at this time." Charles previously participated in a program to address domestic violence, but he did not complete the program; he has been willing to restart the program, but the previous provider may no longer be providing that class.

Peterson stated that Samantha "has attempted to get herself into a [domestic violence] program, but there was not one that takes females that she reported to me"; "she has been working with her counselor . . . on addressing her . . . relationship." According to Peterson, there would need to be a safety plan established with Samantha's counselor or family support to show that Samantha could protect the children from any domestic violence or substance abuse in the home. Additionally, Samantha would need to be open and honest about when she had to use that safety plan. To Peterson's knowledge, no safety plan had been established.

DHHS was concerned about the back-and-forth nature of Samantha and Charles' relationship status, and that despite both reporting their relationship had been toxic in the past, they were trying to make it work again. The DHHS court report and case plan states, "There was a lack of honesty from both Samantha and Charles about their contact throughout the juvenile case." Peterson testified that Samantha continued to do well with her case plan goals and to move forward with her case would include decreased supervision and eventually overnights; however, Charles just started his case plan and it would not be appropriate for him to have unsupervised time with the children. According to the DHHS court report and case plan, because Samantha and Charles "are at two completely different spots in the juvenile case," it "mak[es] moving forward in progress difficult."

Peterson recommended the sole goal of adoption for both children. She noted the length of time the boys had been out of their parents' care and said they deserve stability; "[t]he inconsistency, the back and forth of this juvenile case has started to really wear on Camden, the oldest of the two boys, where he's just having more behaviors and acting more anxious." Peterson stated that it was in the best interests of the children to achieve permanency and stability though adoption.

Samantha testified that she and Charles had been together for about 6 years. When asked if their relationship was "on-and-off," Samantha responded, "It has just been recently on and off while the case has been opened." They lived together until the case was opened, and they were again living together at the time of the hearing. When asked what she had been doing to address the domestic violence issues, Samantha responded, "Working on myself individually in counseling [once a week], working on past trauma[,]" "[a]nd then we're also in couples['] counseling [once a week]." She said she also put a safety plan in place when the State asked her to. When asked if she would allow Charles to continue to live with her children if he was displaying violent behaviors, Samantha responded, "No[,] I would ask him that [sic] he needed to get some serious help before he would ever be allowed back into my house."

To address her substance use, Samantha worked with a substance abuse counselor, worked on coping skills and trigger mechanisms, attended NA meetings, and was "trying just to stay as far away . . . from, like, everything that I can." According to Samantha, she last used marijuana in May 2020, and she was not sure where the THC from her test came from; "[i]t could come from [other people's] clothes," "[i]t could come from if we're outside and they opened up the windows and . . . they were just smoking in their house," "[i]t could come from a car," "[i]t could come from multiple places." She stated she had not used methamphetamine in over 6 years, and she attributes her positive test in August 2021 to a new depression medication.

Samantha did not believe the permanency goal should be changed to adoption because she loved her children and had shown that she could protect and provide for her children. Samantha believed that it was in the children's best interests to return home. According to Samantha, Charles said he was willing to follow through with what the State was asking him to do and what she was asking him to do. She said, "[Charles] and I have both stated to each other and to the counselor that if we are not able to make this work after giving it a fair try with equal effort that we are willing to separate and do co-parenting together."

In addition to the court-appointed special advocate (CASA) report being received into evidence, the CASA orally presented to the juvenile court at the review hearing. The CASA stated

that the parents were both employed, have transportation, and have a stable living environment. However, there are "some pretty significant concerns" with the parents' relationship and unaddressed domestic violence. The mother "is doing a pretty good job" of trying to have consistent visits and her parenting skills look good, but there has been "very little progress" and a "lack of care" on the father's part; "Dad's just kind of trying to move into the house and piggyback on [Mom's] progress, which is concerning."

At the hearing, the juvenile court stated that it generally approved and adopted the DHHS case plan and court report dated December 8, 2021. The court found a continuing exception to the state's obligation to file a motion to terminate parental rights because the children were in a relative placement. The court further found that Samantha had made "great strides" and "but for [her] relationship with [Charles] there don't appear to be any of the original concerns that brought the case before the court that caused the adjudication and the factual basis"; but Charles had "barely" worked on this case and "his behaviors clearly have caused a lot of the problems." The court did note its concern about Samantha's dishonesty and the court did not find her testimony regarding when she tested positive for THC to be persuasive. However, with the progress that had been made, the court did not think it was reasonable to change to a sole goal of adoption, and it decided to maintain the primary goal of reunification with the secondary goal of adoption. In its written order dated December 17, 2021, the juvenile court stated that the permanency goal was reunification with an alternate goal of adoption. The parents were to have reasonable visitation as determined by DHHS. The next review hearing was set for March 23, 2022.

MARCH 2022 REVIEW HEARING AND ORDER

A review hearing was held on March 23, 2022. Testimony was given by DHHS and Samantha; Charles did not testify. Exhibits were also received into evidence. A summary of the relevant evidence follows.

Peterson testified that she had been able to work with Samantha more because Charles' participation and involvement in the juvenile case was very sporadic. Samantha maintained employment, had safe and appropriate housing, had done ongoing counseling, and had completed parenting classes. Samantha had done well overall with visitation, but since January 2022, there had been "concerns frequently of Camden ending up in the road, running away from [Samantha]" and "[t]hey live on an incredibly busy road with big semitrucks"; the issue has been discussed with Samantha. Samantha "is able to demonstrate brief periods of sobriety," and "I think the longest period she's gone without testing positive for any substances would be five weeks"; there was currently no methamphetamine, but she had tested positive for THC, most recently on January 2, 2022. When asked if she could tie Samantha's THC positive tests to her ability to parent, Peterson said, "No."

According to the DHHS case plan and court report, Charles became more engaged in visitation starting in October 2021. During visits with Charles, Camden was overly aggressive towards his younger brother and struggled to be kind to him and follow directions. Camden's aggressive behavior towards his brother and his inability to be redirected were also exhibited following visits with either parent. Peterson attributed those behaviors to "[t]he instability of the case" and said that children need routine, structure, and predictability in their daily lives.

- 6 -

According to Peterson, one of the reasons for removal was domestic violence, which has not improved. "In the brief time that they reinstated their relationship in October of 2021 we have seen arguments escalate to the point where they're not able to have visitation, where [Charles] won't leave [Samantha] alone," and "[Samantha] doesn't follow through with safety plans a hundred percent." Samantha and Charles called their relationship off again as of February 23, 2022. However, there had been concerns about the parents' truthfulness in that they will be separated but there are reports of them being together and just hiding their relationship so that Samantha can work on reunification. Peterson stated that Samantha reported that Charles had moved out as of "last Thursday." According to Peterson, Charles and Samantha were not currently attending couples' counseling.

Peterson testified that Samantha reported that the domestic violence with Charles was only physical when there was substance use. But Peterson said that Charles continues to have drug patches test positive with methamphetamine, and at a February 2022 meeting, Samantha said that Charles' drinking was getting out of hand. Additionally, Charles said that he will continue to use THC despite the juvenile court case. Charles did complete a substance abuse evaluation, but Peterson had not yet received the evaluation.

Peterson stated that Charles was unsuccessfully discharged from a domestic violence intervention program and his discharge summary stated that he had a high likelihood of reoffending. She further testified that, "Domestic violence has been very evident in our family team meeting just this past month where . . . there's continuous gaslighting by [Charles]"; "[a]nd that was in a room full of people that typically you would not have that kind of argument with[,] [s]o what does it look like behind closed doors is a major concern for the department." Domestic violence impacts Samantha's ability to keep the children safe, which impacts the children's physical and emotional well-being. When asked if there was an approved domestic violence program offered to Samantha, Peterson replied, "We've talked about that on several occasions," but "there is a limited amount of services." Peterson said, "There is one in North Platte, [Nebraska,] but it wasn't going to work with her schedule of work." When asked if that program was currently available, Peterson replied, "I guess I am not aware." Peterson was then asked if she was aware of any approved domestic violence program that Samantha could have attended but did not attend, Peterson said, "No"; she also said, "I have provided her resources for domestic violence, like the Parent-Child Center in the midst of it because I don't have any classes."

Peterson believed it was in the children's best interests to achieve permanency through adoption. When asked if there was any reason at this time to have an exception to that, Peterson responded, "No, there is not." She said, "There has been ample time, ample services, and multiple opportunities to allow [Samantha] to work reunification and [Charles] to be involved in this juvenile case and we're still addressing some of the concerns that we're addressing at the beginning of the juvenile case." In Peterson's opinion, there were no services that had not already been offered that would help the situation. If the juvenile court adopted her recommendation to make the permanency goal be adoption only, Peterson said she would "decrease the visitation schedule to, essentially, no more visits."

Peterson confirmed that Samantha has had semisupervised visitation since June 2021 and the providers note that she had done well during visits; Samantha had not progressed to overnight visits because until recently Charles was living in the home. Peterson was asked what DHHS' plan

for starting overnight visits was now that Charles was out of the home. According to Peterson, Samantha does have a safety plan in place, but "[w]e would need to go back to . . . that honesty piece and trusting that [Samantha] can build up a safety network and be honest and follow all of what she sets out to do in those safety plans"; there was lack of follow-though in previous safety plans. Peterson agreed that Samantha had shown weeks of sobriety and progression in her parenting skills, but said, "The department's concern is [Samantha] is able to articulate that her relationship is not healthy, that she herself doesn't want her boys to see this relationship, but she doesn't know how to stay out of that relationship." In the DHHS court report and case plan dated March 17, 2022, DHHS recommended a sole goal of adoption for both Camden and Kaydence.

The guardian ad litem's (GAL) report dated March 23, 2022, was received into evidence and states,

> [Samantha] has shown promise in being able to work her goals on her own; however, she appears to be in constant limbo on being able to do so without continuing contact with [Charles]. [Charles] appears to have the attitude that he does not care to comply with the terms of the CPCR from HHS. There continues to be concerns with employment stability on the part of [Charles], living circumstances with the parties, honesty with the Department, utilizing and completing services provided and volatility between the parties and in their home. Unfortunately, I believe the parents have been too inconsistent with several aspects of both cases to recommend reunification as being in the best interests of their children.

The GAL marked the box stating that he was in agreement with the recommendations made by DHHS. The CASA report dated March 16, 2022, and the Foster Care Review Board report dated March 11, 2022, both recommended a goal of adoption for the children.

Samantha testified that Charles moved back in with her in late October 2021, and she told him that if he wanted to be in the home, he had to have a job, have clean drug patches, and do anything the State asked him to do; to her knowledge, that was happening for some time. Samantha later learned that Charles tested positive for methamphetamine and had not been truthful with her, but she was not worried about him being under the influence of marijuana "as long as it was not around my children or in my house." She asked Charles to move out the day of the team meeting on February 23, 2022, and he subsequently moved out on March 16. She said that she and Charles "have had limited to no contact." Samantha stated that she and her counselor

> created two safety plans, one for when the kids are present and one for when the kids are not present. And the one for when the kids are not present, I would take a time-out, leave, go over to a friend's house. If [Charles] continue harassing me, I would call the police. . . .
>
> . . . .
>
> [When the children are present, the plan is to] [g]o by, like, signals, . . . like either what I would give off or what he would give off before an escalation. And before it escalated I would take . . . myself and the kids to the park if it's nice out, take them over to a friend's house and play and just separate them from the situation.
>
> And then if there is still tension later, then I would also be getting ahold of somebody . . . to say, hey, would you mind watching the kids while we get this figured out.

Samantha's safety plan involved intervening before things got bad. When asked why she did not call the police in January despite Charles continuing to bother her, Samantha said that she had not created the safety plan yet. According to Samantha, Charles no longer has a key to her home.

On cross-examination, Samantha acknowledged that throughout the past 24 months of the juvenile case, she had been in and out of a relationship with Charles. She acknowledged that there was still emotional turmoil and fights on February 23, 2022 (the date of the team meeting). She then said there had not been emotional turmoil or fights "since he's moved out," but acknowledged that Charles just moved out the previous week.

Samantha believed that it was in the children's best interest for the juvenile court to order reunification "so that way I would be able to prove that . . . I am able to keep [Charles] out and keep the best interests of my children at heart."

Following the testimony, the State's recommendation was "to have the sole goal as adoption and to adopt the case plan put forward by [DHHS] and that no exception be found." The children's GAL also recommended "adoption only," but did note that Samantha had made a lot of progress since the last review period.

The juvenile court stated that the children are placed in foster care with family so "the exception is obvious, but that doesn't mean that the state can't move forward or that I can't adopt the goal." The court said, "[T]his is a difficult case, as everyone has pointed out." However, "the time to rehabilitate the parents has been 24 months," "[t]hat hasn't all applied in Kaydence's life," but "the issues are just the same." Samantha "hitched" her future to Charles since at least October 2021 when she officially took him back in the home, "and now she's got to live with the consequences of that decision." The court said Samantha "has done what she should have done for the last week or two," but that "just isn't good enough." The court then found that the sole goal of the case should be adoption. It its written order dated March 23, 2022, the court adopted the DHHS case plan of March 17 and ordered all parties to comply with its terms, ordered reasonable visitation as determined by DHHS, and stated that the permanency goal was adoption.

Samantha appeals.

## ASSIGNMENTS OF ERROR

Samantha assigns that (1) the change in permanency objectives was not supported by sufficient evidence and was not in the children's best interests, (2) the juvenile court erred in finding that reasonable efforts had been made to preserve and reunify the family, and (3) the juvenile court should have found an exception to the requirement to file a petition to terminate parental rights.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

## ANALYSIS

### JURISDICTION

We must first determine whether we have jurisdiction, which turns upon whether the order changing the primary permanency objective affected a substantial right. In a juvenile case, as in any other appeal, before reaching the legal issues presented for review, it is the duty of an appellate court to determine whether it has jurisdiction over the matter before it. *In re Interest of Octavio B. et al.*, 290 Neb. 589, 861 N.W.2d 415 (2015). For an appellate court to acquire jurisdiction of an appeal, there must be a final order entered by the court from which the appeal is taken. *Id.* Juvenile court proceedings are special proceedings under Neb. Rev. Stat. § 25-1902 (Cum. Supp. 2020), and an order in a juvenile special proceeding is final and appealable if it affects a parent's substantial right to raise his or her child. See *In re Interest of Octavio B. et al., supra.*

We find that the change in permanency to a sole goal of adoption in this case was a final appealable order because the juvenile court also ordered that reasonable visitation was to be determined by DHHS and there was evidence at the review hearing that if the sole goal was adoption, then DHHS would "decrease the visitation schedule to, essentially, no more visits." See, *In re Interest of Octavio B. et al., supra* (order changing permanency goal from reunification to adoption was final and appealable because record indicated mother would not be given further opportunity for compliance with case plan); *In re Interest of Diana M. et al.*, 20 Neb. App. 472, 825 N.W.2d 811 (2013) (juvenile court's modification of permanency goal from reunification to guardianship/adoption appealable because plan objective was coupled with order ceasing further reasonable efforts for reunification). Compare *In re Interest of Tayla R.*, 17 Neb. App. 595, 767 N.W.2d 127 (2009) (order changing permanency plan goal from reunification to adoption not appealable because it did not affect substantial right; order implemented rehabilitation plan that contained same services as previous order, did not change mother's visitation status, and implicitly provided mother opportunity for reunification by complying with terms of rehabilitation plan). Because we have jurisdiction, we can address Samantha's assigned errors.

### PERMANENCY OBJECTIVE

Samantha argues that the change in permanency objective was not supported by sufficient evidence and was not in the children's best interests. We disagree.

The foremost purpose and objective of the Nebraska Juvenile Code is the protection of a juvenile's best interests, with preservation of the juvenile's familial relationship with his or her parents where the continuation of such parental relationship is proper under the law. *In re Interest of Octavio B. et al., supra.* The goal of juvenile proceedings is not to punish parents, but to protect children and promote their best interests. *Id.* Once a child has been adjudicated under § 43-247(3), the juvenile court ultimately decides where a child should be placed. *In re Interest of Octavio B. et al., supra.* Juvenile courts are accorded broad discretion in determining the placement of an adjudicated child and to serve that child's best interests. *Id.* The State has the burden of proving that a case plan is in the child's best interests. *Id.*

The evidence demonstrated that while Samantha had made a lot of progress toward the goal of reunification, there were ongoing concerns about her relationship with Charles. Samantha and Charles had a history of domestic violence and had only recently separated again, but there

were also concerns about their honesty regarding their relationship. Additionally, there was ongoing drug use by Charles, and Samantha herself told DHHS that the domestic violence only got physical when there was substance use.

As stated by the juvenile court, "the time to rehabilitate the parents has been 24 months," "[t]hat hasn't all applied in Kaydence's life," but "the issues are just the same." Samantha "hitched" her future to Charles since at least October 2021 when she officially took him back in the home, "and now she's got to live with the consequences of that decision." The court said Samantha "has done what she should have done for the last week or two," but that "just isn't good enough."

Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Octavio B. et al., supra*. At the time of the March 2022 hearing, Camden had been in out-of-home placement for 24 months, and Kaydence had been in out-of-home placement for 10 months. The evidence established domestic violence and substance use were concerns at the time of Camden's removal in early 2020 and they remained concerns at the time of the March 2022 review hearing. Given this evidence, it was in the children's best interests to change the primary permanency objective to adoption.

REASONABLE EFFORTS

Samantha argues the juvenile court erred in finding that reasonable efforts had been made to preserve and reunify the family.

Pursuant to Neb. Rev. Stat. § 43-283.01(2) (Cum. Supp. 2020), reasonable efforts shall be made to preserve and reunify families prior to the placement of a juvenile in foster care to prevent or eliminate the need for removing the juvenile from the juvenile's home and to make it possible for a juvenile to safely return to the juvenile's home.

Prior to Camden being removed from the home and the filing of the petition in March 2020, DHHS provided this family a voluntary case with intensive family preservations services. Since Camden's removal and the filing of the petition, DHHS has provided case management, relative foster care, substance use testing, family support, monthly team meetings, safety planning, and visitation. DHHS has also provided Samantha and Charles referrals for substance abuse and mental health evaluations, ongoing therapy, and parenting classes. Additionally, DHHS provided a referral to a domestic violence intervention program for Charles, but he was unsuccessfully discharged from the program.

On appeal, Samantha claims that DHHS failed to make reasonable efforts in the area of domestic violence. Samantha argues, "[DHHS] has expressed concerns regarding domestic violence in this case and has stated that the relationship between Samantha and [Charles] is the biggest safety concern," "[h]owever, this concern was afforded little to no services or efforts and definitely failed to reach the standard of reasonable efforts." Brief for appellant at 17. As noted previously, DHHS did provide Charles with a referral for a domestic violence intervention program, but he was unsuccessfully discharged from the program. Samantha's real complaint is the lack of an approved domestic violence program for herself. Peterson testified that there was one program in North Platte that Samantha called about but it would not work for her schedule. Samantha did have access to individual and couples' counseling and family support, but she claims

those services did not really teach or talk to her about domestic violence, and just addressed it "a little bit." Samantha also had access to safety planning.

Based on our de novo review of the record, we find that reasonable efforts were made to preserve and reunify the family.

EXCEPTION TO FILING FOR TERMINATION

Pursuant to Neb. Rev. Stat. § 43-292.02(1)(a) (Cum. Supp. 2020), a petition to terminate parental rights shall be filed if a juvenile has been in foster care under the responsibility of the state for 15 or more months of the most recent 22 months. However, a petition to terminate parental rights is not required to be filed if the child is being cared for by a relative. See § 43-292.02(3)(a).

Samantha argues that at the March 2022 hearing the juvenile court should have found an exception to the requirement to file a petition to terminate parental rights because Camden continued to reside with his grandparents. Kaydence had not yet been in foster care long enough for § 43-292.02 to apply to him.

At the March 2022 review hearing, the State recommended the sole goal of adoption and that no exception be found. Although the juvenile court initially stated that it "[didn't] know whether the court has any power to find an exception or not find an exception in this case," it ultimately concluded that "the exception is obvious [the children are placed in foster care with family], but that doesn't mean that the state can't move forward or that I can't adopt the goal [of adoption]." We find no error with the juvenile court's statement regarding the exception or effects thereof. See, e.g., *In re Interest of Madison T. et al.*, 30 Neb. App. 470, 970 N.W.2d 122 (2022) (affirming termination of mother's parental rights to three children using § 43-292(7) as statutory basis; for more than 1 year prior to filing of petition to terminate mother's rights, two children had been living with their fathers and third child had been living with maternal great aunt).

CONCLUSION

For the reasons stated above, we affirm the juvenile court's decision to change the permanency goal for Camden and Kaydence to adoption.

AFFIRMED.